## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| **IRA GALLOWAY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Civil Action No. 2008-071** |
| ) | |
| **ISLANDS MECHANICAL** ) | |
| **CONTRACTOR, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

**Attorneys:**
**Lee J. Rohn, Esq.,**
**Mary Faith Carpenter, Esq.,**
St. Croix, U.S.V.I.
    *For the Plaintiff*

**Andrew C. Simpson, Esq.,**
**Emily A. Shoup, Esq.,**
**Rachelle M. Shocklee, Esq.,**
St. Croix, U.S.V.I.
    *For the Defendant*

## <u>MEMORANDUM OPINION</u>

**Lewis, District Judge**

    THIS MATTER comes before the Court on the Motion for Summary Judgment filed by Defendant, Islands Mechanical Contractor, Inc. ("Defendant" or "IMC"), on January 31, 2012. (Dkt. No. 104). In this employment discrimination action, Plaintiff Ira Galloway ("Plaintiff" or "Galloway") has asserted federal and local causes of action against IMC alleging, *inter alia*, that IMC's failure to promote him and assign him overtime, and his subsequent termination, were motivated by racial discrimination and/or retaliation. IMC argues that Plaintiff has established no basis to hold it liable under any of the theories asserted by Galloway in his First Amended

Complaint. For the reasons that follow, the Court will grant in part and deny in part IMC's Motion for Summary Judgment.

## I.   <u>BACKGROUND FACTS</u>

In 2007, IMC was awarded a contract to build a heat recovery steam generator ("HRSG") for the Water and Power Authority of the Virgin Islands ("WAPA") on St. Croix, U.S. Virgin Islands. (Plt.'s Counter Statement of Facts ("PCSOF") at ¶ 1[1], Dkt. No. 114-7; Def.'s Response to PCSOF ("DRPCSOF") at ¶ 1, Dkt. No. 133).

In mid-November 2007, Galloway went to the HRSG job site seeking employment and met Derek Spann, an IMC crane operator. (Galloway Dep. at 5, Dkt. No. 114-1).[2] Galloway told Spann that he was looking for a crane operator job, but that he could also perform heavy equipment mechanic work. *Id*. Spann stated that he needed a mechanic right away and asked if Galloway could work as a mechanic for the duration of the project. Galloway informed Spann that he was laid off from another contractor and "could work temporarily with him," since he expected to be recalled by that contractor. *Id*. at 5-6. After a few days on the job, Spann told Galloway that when IMC became better "organized," Galloway would be given a "foreman [of heavy equipment] position with some helpers," and he would receive a raise. *Id*. at 6-7. Galloway considered Spann as his "boss." *Id*. at 7.  Galloway was paid $20.00 per hour at the

---

[1]     Local Rule of Civil Procedure 56.1(b) provides, *inter alia*, that the party adverse to a motion for summary judgment "must address the facts upon which the movant has relied. . . either (i) agreeing that the fact is undisputed; (ii) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (iii) demonstrating that the fact is disputed." LRCi 56.1(b). Plaintiff's "Response to Defendant's Statement of Undisputed Facts" violates the Local Rule, in that his responses are variously non-responsive, argumentative, conclusory, and appear to be improperly used by Plaintiff to advance his case-in-chief. The length of the responses serves to make the litigation much more cumbersome and serves to obscure, not clarify, the issues.

[2]     The Court refers to deposition pages by their ECF docket entry page number.

outset, and was the only mechanic on the job. (Galloway Dep. at 6, Dkt. No. 114-1). In January

2008, Galloway received a raise to $25.00 per hour and his title changed to "Master Mechanic."

(Turnage Dep. at 5, 18, Dkt. No. 114-8; IMC Memo re: raises, Dkt. No. 133-).

     In October 2007, Jerry Rollins, a salaried, longtime IMC employee, arrived in St. Croix

to work as the Equipment Superintendent on the HRSG Project. His job was to ensure that all of

the equipment was running properly. He became ill, stayed less than a month, and returned to the

mainland.  He returned to St. Croix to work on the HRSG Project from January 25, 2008 through

April 5, 2008 in the same capacity as when he left. (Rollins Dep. at 7, 9, Dkt. No. 115-4;

Turnage Dep. at 23, Dkt. No. 114-7).

     The HRSG Project was completed in stages. The initial phase involved the excavation

and pouring of the foundation and lasted from August 2007 through January 2008. (Turnage

Dep. at 15, Dkt. No. 114-7). IMC rented three Manitowoc cranes (a 2250, a 4100, and a 4000

model) from Essex Crane Rental Co., based in Florida. In fall 2007, barges transported the

cranes to St. Croix. (Talbot Dep. at 3, Dkt. No. 114-3; Turnage Dep. at 17, Dkt. No. 114-7).  The

2250 model was the "main workhorse" used to set up the boiler. (Talbot Dep. at 3, Dkt. No. 114-

3). IMC contracted with Essex to provide mechanics to fix the highly-complex Manitowoc

cranes. IMC owned two smaller linkbelt cranes, as well as loaders, backhoes, track hoes and

other heavy construction equipment, which it also transported to the site. (Talbot Dep. at 3, Dkt.

No. 114-3; Turnage Dep. at 19, Dkt. No. 114-7; Turnage Dep. at 14, Dkt. No. 114-8).

     Eugene Barnes, the Project Superintendent, Randy Talbot, the Project Manager, and

Robert Turnage, an IMC owner and Chief Financial Officer, testified that part of Galloway's job

was to assist the Essex mechanics when they came to St. Croix to work on the Manitowoc

cranes. (Talbot Dep. at 3, Dkt. No. 114-3; Barnes Dep. at 11, Dkt. No. 114-9; Turnage Dep. at

13, Dkt. No. 114-8). Galloway confirmed that he worked "primarily" on the two largest cranes on the worksite—the Manitowoc 2250 and 4100 models—which needed more work than the linkbelt cranes. (Galloway Dep. at 13, Dkt. No. 114-1). His job duties also included light mechanic work, oiling, and driving the transporter. (Turnage Dep. at 13, Dkt. No. 114-8).

Livingstone Williams, a black West Indian, and Josh Ray, a white man in his early 20's who had just graduated from heavy equipment school, assisted Galloway at IMC. (Def.'s Statement of Facts ("DSOF") at ¶¶ 9-11, Dkt. No. 105; Plt.'s Response to DSOF ("PRDSOF") at ¶¶ 9-11, Dkt. No. 114; Galloway Dep. at 11, Dkt. No. 114-1; Talbot Dep. at 18, Dkt. No. 114-2; Turnage Dep. at 14, Dkt. No. 114-8). Williams and Ray were oilers—responsible for oiling the machinery—and mechanic/helpers who did some light mechanic work. (Turnage Dep. at 14, Dkt. No. 114-8). Ray was hired in April 2008, came down to St. Croix with a work crew from the mainland, and worked until June 7, 2008. (Jones Dep. at 9, Dkt. No. 115-1; Ray Empl. Agreement, Dkt. No. 133-2). Ray received $75 per day as a per diem for housing and other costs. (Jones Dep. at 20, Dkt. No. 115-1). Williams was paid $20.00 per hour and Ray was paid $18.00 per hour.  (DSOF ¶¶ 9, 11; PRDSOF ¶¶ 9, 11).

In February 2008, Galloway began complaining to Dooley Jones—Derek Spann's replacement—that he had not been made foreman.  (Galloway Dep. at 7-8, Dkt. No. 114-1; Jones Dep. at 18, 20).  Jones consulted with Talbot, the Project Manager, who told Jones that IMC did not need an equipment foreman on the HRSG Project. Jones conveyed Talbot's response to Galloway, who was unhappy about it. (Jones Dep. at 18, Dkt. No. 115-1).

Galloway testified that, during three weekends in May 2008, he should have been asked to work overtime, but workers "from the States" performed that overtime. (Galloway Dep. at 10-12, Dkt. No. 114-1). Specifically, on Friday, May 2, 2008, parts had arrived to repair a leak in

one of the smaller linkbelt cranes. Instead of asking Galloway to repair it on Saturday, May 3rd, and earn overtime, Dooley Jones told him to stay home, that there was no work, and then asked Ray to do the work. Williams told Galloway that he and Ray worked on the crane that day. *Id.* at 14. On Friday, May 9, Galloway was again told there was no overtime work and not to come to work on May 10th. He later learned from Williams that Williams and Ray worked that Saturday, although he did not know the nature of the work they performed. On Friday, May 23rd, Galloway was once again told to stay home as there was no overtime work. Williams told Galloway that he was asked to come in on May 24th to help Ray repair one of the linkbelt cranes. *Id.* at 14-16.

At the end of May 2008, IMC began to integrate the electrical, piping, and instrumentation systems on the Project. Two of the Manitowoc cranes (the 2250 and 4000 models) were no longer needed on site. They were disassembled and put on a barge that arrived in Florida on June 5, 2008. (DSOF at ¶ 6; PRDSOF at ¶ 6; Talbot Dep. at 6-7, 19, Dkt. No. 114-3; Turnage Dep. at 26, Dkt. No. 114-7; Turnage Dep. at 14, Dkt. No. 114-8). At this point, Jones spoke with Talbot, who said that the "cranes [were] coming off the ramp [and] he didn't see where [IMC] needed a master mechanic and we [Talbot and Jones] agreed to go ahead and lay [Galloway] off." (Jones Dep. at 26, Dkt. No. 115-1). Talbot told Jones that the two helpers (Ray and Williams) could "finish what little bit of stuff" there was left to do. *Id.* at 19, 26. The Manitowoc 4100 remained on site for approximately four months, and was used sporadically. (Turnage Dep. at 14, Dkt. No. 114-8). The transporter was not in use after May 27, 2008 but remained on site until it was shipped out on a barge. *Id.* at 13.

On May 27, 2008, IMC laid off Galloway. According to Turnage, Galloway's termination was a construction layoff: "We were cutting way back on the number of cranes and

the heavier pieces of equipment that I had on the job site. [Galloway] was the mechanic that assisted the Manitowoc mechanic when he came in to work on the big cranes, and when [the Manitowoc mechanic] was not coming in anymore, then I didn't need [Galloway] for that function." (Turnage Dep. at 13, Dkt. No. 114-8). After Plaintiff was laid off, a mechanic from Essex and "either Livingston or Josh [Ray]" did mechanical repairs. (Jones Dep. at 20, Dkt. No. 115-1). However, "shortly after" IMC laid Plaintiff off, IMC "started breaking the cranes down and getting ready to go on the barge." *Id*. IMC laid off other positions reportedly to save money. (Talbot Dep. at 6, Dkt. No. 114-3). In total, IMC laid off seventeen employees between May 26, 2008 and June 19, 2008. (Def.'s "Fed. R. Evid. 1006 Summary of Employees Terminated by IMC between May 20 and June 19, 2008," Dkt. No. 176-1). Four of those seventeen employees self-identified as black, six self-identified as white, two self-identified as Hispanic, and five did not identify their racial or ethnic group. *Id.*

In approximately the "middle of June" 2008, Plaintiff spoke with Buddy Martin—the Project Superintendent who assumed Gene Barnes' duties when he left—to ask for his job back. According to Galloway, Martin told him that IMC needed his services because he was "a good worker, and [he] got the job done, and they had a lot of problems with the equipment." (Galloway Dep. at 12, 16, Dkt. No. 114-1). Galloway further stated that, because he had complained about IMC to the Virgin Islands Department of Labor Relations ("DOL"), Turnage had told Martin that IMC would not rehire him, and Martin conveyed that to Galloway. *Id.* at 12.[3]

---

[3]     As discussed more fully below, Galloway filed an official complaint with the Virgin Islands Department of Labor (DOL) and Equal Employment Opportunity Commission (EEOC) on July 8, 2008. (*See* DOL Complaint at 2, Dkt. No. 133-4). In his allegations to the DOL, Galloway states that he complained to IMC about "discriminatory pay, benefits, and overtime . . . in May 2008." *Id.*

Dooley Jones was responsible for terminating other IMC employees.  One such employee was Pius Jay Hubert, who was hired by IMC as an ironworker on the WAPA project in March 2008. (Hubert Dep. at 4, Dkt. No. 115-3; DRPCSOF ¶ 14, Dkt. No. 133-6).  Hubert was demoted for allegedly not knowing proper crane signals. *Id*. at 6. According to Hubert, he was terminated by Jones approximately a week later. *Id*. During the termination, Hubert claims that Jones said "the niggers here don't know nothing, and that's why we bring guys from the states."  *Id*.

## II.  PROCEDURAL HISTORY

On August 8, 2008, Plaintiff filed a Complaint against IMC in District Court, alleging claims of racial discrimination under Title VII, 42 U.S.C. §§ 2000e-2000e-17 (Count 1), and several Virgin Islands anti-discrimination statutes, 10 V.I.C. §§ 1-7, 61-72, and 24 V.I.C. §§ 451-462 (Count 2); wrongful discharge (Count 3); breach of the implied covenant of good faith and fair dealing (Count 4); and punitive damages (Count 5). (*See* Complaint, Dkt. No. 1). Plaintiff filed a First Amended Complaint ("FAC") on August 9, 2010, to reflect receipt of a Right to Sue Letter from the EEOC. (FAC at ¶ 28, Dkt. No. 32).

On January 31, 2012, IMC filed the instant Motion for Summary Judgment. (Dkt. No. 104). Plaintiff filed his Amended Opposition to IMC's Motion for Summary Judgment on April 10, 2012 (Dkt. No. 168), and Defendant filed its Amended Reply on April 24, 2012. (Dkt. No. 176).[4] On April 18, 2012—eight days after filing his Amended Opposition—Plaintiff filed a motion to supplement its Opposition with an affidavit from Livingstone Williams, an IMC employee. (Dkt. No. 171). Defendant opposed Plaintiff's motion. The Court denied the motion on September 11, 2012. (Dkt. No. 202).

---

[4]     IMC moved to strike Plaintiff's Opposition to IMC's Motion for Summary Judgment because the thirty-seven page Opposition exceeded the maximum page limit under LRCi 56.1(e). (Dkt. No. 122). The Court granted the motion, but permitted plaintiff to file an Amended Opposition that complied with the Local Rule's twenty-page limit. (Dkt. No. 158).

# III.  DISCUSSION

## A.  Summary Judgment Standard

On a motion for summary judgment, the movant must show that there is "no genuine dispute as to any material fact," such that he is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To be material, a fact must have the potential to alter the outcome of the case.  *See Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *N.A.A.C.P. v. N. Hudson Regional Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (citation omitted). In adjudicating a summary judgment motion, the court must view the facts "in the light most favorable to the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "After the movant shows there is no genuine issue for trial, the non-moving party then bears the burden of identifying evidence that creates a genuine dispute regarding material facts." *N. Hudson*, 665 F.3d at 475 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). When the nonmoving party "'bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden.'" *Foulk v. Donjon Marine Co., Inc.,* 144 F.3d 252, 258 n.5 (3d Cir. 1998) (citation omitted). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (citation omitted).

## B.  Title VII Cause of Action

In his First Amended Complaint, Galloway asserts that he was discriminated against by IMC on the basis of race, color, and national origin, in violation of Title VII, when: (1) IMC terminated him; (2) IMC did not assign him overtime work in May 2008; and (3) IMC did not

promote him to foreman. Plaintiff also claims that his termination and IMC's refusal to rehire him was the product of unlawful retaliation.

Title VII states, in pertinent part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1). In addition, Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

In Title VII cases such as this, where a plaintiff lacks direct evidence that he was discriminated against on the basis of race, courts apply the familiar burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Generally, in order to establish a *prima facie* case, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; (4) under circumstances that support an inference of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002); *see also Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). "The evidentiary burden at this stage is rather modest . . . [it] 'is not intended to be onerous.'" *Marzano v. Computer Sci. Corp.*, 91 F.3d 497, 508 (3d Cir. 1996) (citation omitted). If the plaintiff establishes a *prima facie* case, the burden of production then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its conduct. *McDonnell Douglas*, 411 U.S. at 802. Once the employer meets this "relatively light burden," the burden of production returns to the plaintiff to show that the defendant's proffered reason is a pretext for

discrimination. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). At this stage, the plaintiff's burden of demonstrating pretext "merges with [the plaintiff's] ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

A plaintiff may show pretext by "present[ing] sufficient evidence to meaningfully throw into question, *i.e.*, to cast substantial doubt upon," the defendant's proffered reasons for the adverse employment action. *Fuentes*, 32 F.3d at 765. He may do so "by painting [the proffered reasons] as weak, implausible, contradictory, or incoherent," or by coming forward

> with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision (e.g., by showing that . . . the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons).

*Id.*; *see also Ansell v. Green Acres Contracting Co., Inc.*, 347 F.3d 515, 521 (3d Cir. 2003) ("Evidence of an employer's conduct towards other employees has long been held relevant and admissible to show that an employer's proffered justification is pretext.") (citing *McDonnell Douglas Corp.*, 411 U.S. at 804)).

### 1. Termination

IMC asserts that "Plaintiff and numerous other employees were terminated when the WAPA project began nearing an end." (Def.'s MSJ at 12, Dkt. No. 104; *see also* DSOF at ¶ 14). In order to make out a *prima facie* case of unlawful discrimination in the context of a reduction-in-force claim, as asserted here by IMC, "'the plaintiff must show he was in [a] protected class, he was qualified, he was laid off and other unprotected workers were retained.'" *Marzano*, 91

F.3d at 502 (citation omitted).[5] Once a plaintiff makes a *prima facie* case, the burden shifts to the employer "to offer an explanation other than discrimination why the employee suffered an adverse employment action." *Id*. at 508. "[I]f the employer proffers a reason and the plaintiff can produce enough evidence to enable a reasonable factfinder to conclude that the proffered reason is false, plaintiff has earned the right to present his or her case to the jury." *Id*.

Regarding his *prima facie* termination case, it is undisputed that Plaintiff, a black male of West Indian descent, is in a protected class and was qualified for the mechanic job from which he was laid-off. Thus, the first three elements of the *prima facie* case have been met. *Marzano,* 91 F.3d at 502. Regarding the fourth element—the retention of someone outside of Plaintiff's protected class—Plaintiff's record evidence consists of the fact that Ray, a white oiler, was retained to do work similar to the work Plaintiff had been doing before his termination. (Jones Dep. at 9, 20, Dkt. No. 115-1).[6] This is sufficient to satisfy the fourth prong of Plaintiff's *prima* facie case. *Marzano*, 91 F.3d at 503.

IMC maintains that it had legitimate, nondiscriminatory reasons for terminating Galloway. Specifically, IMC argues that it terminated Plaintiff because the work that he was

---

[5]    The Third Circuit has "repeatedly emphasized that the requirements of the *prima facie* case are flexible, and in particular that 'the fourth element must be relaxed in certain circumstances as when there is a reduction in force.'" *Pivirotto v. Innovative Sys., Inc*., 191 F.3d 344, 357 (3d Cir. 1999) (quoting *Torre v. Casio, Inc*., 42 F.3d 825, 831 (3d Cir. 1994)). In *Marzano*, the Court explained that in the context of an assertion by the defendant that the plaintiff was terminated as part of a reduction in force, it is "'unnecessary for the plaintiff to . . . show that he was actually replaced by' someone outside the protected class"; rather, a plaintiff need only show that he was "discharged, while the [employer] retained someone [outside the protected class]." *Marzano*, 91 F.3d at 503 (citations omitted).

[6]    Plaintiff also claims that "other White and Puerto Rican workers" were retained to do *his* job. (Plt.'s Opp. to MSJ, Dkt. No. 168 at 6). However, Plaintiff has failed to point to any evidence in the record to support this claim. Accordingly, he has not raised a genuine issue of material fact on this issue. *See Berckeley Inv. Grp., Ltd. v. Colkitt,* 455 F.3d 195, 201 (3d Cir. 2006) ("[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record, and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.").

"primarily" hired to do—working on the large Manitowoc cranes—was essentially completed and there was insufficient work to keep three workers—Ray, Williams, and Plaintiff—busy. IMC claims that it "made the rational decision to lay off the most expensive of the three employees—Plaintiff." (Def.'s Reply at 7, Dkt. No. 176). The evidence supports this contention.[7] The Court thus finds that IMC has satisfied its "relatively light burden" of coming forward with legitimate, nondiscriminatory reasons for terminating Plaintiff. *Fuentes*, 32 F.3d at 763; *see also Lidwell v. Univ. Park Nursing Care Ctr.*, 116 F. Supp. 2d 571, 584 (M.D. Pa. 2000) (reducing plaintiff's hours as part of an effort to save money on nurses was a legitimate, nondiscriminatory reason for not scheduling plaintiff to come into work); *Morris v. ADC Telecomms., Inc.*, 2010 WL 3211166, at *4 (W.D. Tex. Aug. 10, 2010) (evidence that terminated employee was replaced by less expensive employee supported a legitimate nondiscriminatory reason for termination).

The burden shifts back to Plaintiff to "produce enough evidence to enable a reasonable factfinder to conclude that the proffered reason is false." *Marzano*, 91 F.3d at 508. Plaintiff attempts to undermine IMC's proffered reasons by, *inter alia*, offering evidence that IMC discriminated against other IMC employees in his protected class. Plaintiff has produced evidence that Jones used the word "nigger" frequently in personal conversations with Equipment

---

[7]     Turnage testified that IMC was "cutting way back on the number of cranes and the heavier pieces of equipment that [it] had on the job site. [Galloway] was the mechanic that assisted the Manitowoc mechanic when he came in to work on the big cranes, and when [the Manitowoc mechanic] was not coming in anymore, then I didn't need [Galloway] for that function." (Turnage Dep. at 13, Dkt. No. 114-8). At the end of May 2008, the two largest Manitowoc cranes were no longer needed on site. They were disassembled and put on a barge that arrived in Florida on June 5, 2008. (DSOF at ¶ 6; PRDSOF at ¶ 6; Talbot Dep. at 7, Dkt. Nos. 114-3; Turnage Dep. at 26, Dkt. No. 114-7; Turnage Dep. at 14, Dkt. No. 114-8). Talbot told Jones that the two helpers (Ray and Williams) could "finish what little bit of stuff" there was left to do. (Jones Dep. at 19, 26, Dkt. No. 115-1).

Superintendent Rollins. (Rollins Dep. at 24-25, Dkt. No. 115-4).[8] Further, Plaintiff has come forward with evidence that, on or about March 28, 2008, Jones fired Pius Hubert—a black West Indian employee who was also working on the WAPA project—and during the termination process allegedly said to Hubert, "the niggers here don't know nothing, and that's why we bring guys from the states." (Hubert Dep. at 4, Dkt. No. 115-3; List of Employee Hiring and Termination Dates, Dkt. No. 133-6 at 2).[9] In response Defendant argues that "the claims of . . . Jay Pius Hubert are not a part of this case and are completely irrelevant." (Def.'s Reply to PCSOF at 5, Dkt. No. 133).

"[E]vidence regarding an employer's treatment of *other members of a protected class* is especially relevant to the issue of the employer's discriminatory intent." *Ansell,* 347 F.3d at 523 (citation omitted and emphasis added); *see Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1214-15 (3d Cir. 1995) (statement made by Kurtz, the plaintiff's supervisor, to other employees that "things would begin to hum around here when we got rid of the old fogies," and evidence that Kurtz referred to employees as "a dinosaur" and "old men . . . were probative of whether Kurtz harbored a discriminatory attitude against older workers, and if credited, that evidence made the existence of an improper motive for the discharge decision more probable.") (citing *Fuentes*, 32 F.3d at 765); *Brown v. Trustees of Boston Univ.*, 891 F.2d 337, 349-50 (1st Cir. 1989) (holding that university president's "patronizing" comments to another female employee referring to her department as a "damn matriarchy" and that she need not worry about tenure because her husband was a "parachute" were probative of president's intent regarding his tenure decision concerning plaintiff because they "suggested a preoccupation with gender in a context where

---

[8]     Jones denies ever using this racial epithet. (Jones Dep. at 39, Dkt. No. 115-1).

[9]     Jones denies making this statement.  (Jones Dep. at 40, Dkt. No. 115-1).

both the contract and the law would expect a sex-blind approach.") (cited with approval in *Becker v. ARCO Chemical Co.*, 207 F.3d 176, 194 n. 8 (3d Cir. 2000)).

Here, the racially-charged statement allegedly made by Jones to Hubert (the "Jones statement"), if credited, is probative of whether Jones harbored a discriminatory attitude against black West Indian workers and is thus relevant to Jones' intent regarding the termination of Plaintiff. Dooley Jones—whom the evidence suggests was Plaintiff's supervisor and involved with Plaintiff's termination—allegedly made the statement in the context of Hubert's termination. (Jones Dep. at 26, Dkt. No. 115-1; Galloway Dep. at 7-8, Dkt. No. 114-1). Accordingly, there is a substantial congruency of context between the alleged Jones statement and this case, thus enhancing its probative value. *See Abrams*, 50 F.3d at 1214 ("[T]he jury could have reasonably found that Kurtz played a role in Lightolier's decision to discharge Abrams. Evidence that Kurtz harbored age-related animus would thus be relevant to determining whether the discharge decision resulted from discriminatory motives."); *Torre*, 42 F.3d at 834 (noting that evidence of age-biased comments by supervisor could lead to inference that termination decision was made because of plaintiff's age). Additionally, there is a close temporal proximity— approximately two months—between the alleged Jones statement and Plaintiff's termination. *See Ansell*, 347 F.3d at 524 (noting that the temporal proximity between "the other act and the act alleged to be discriminatory" is a relevant consideration).

Further, the actual content of the alleged Jones statement, if credited, evinces more than just a passing comment or "stray remark"—it demonstrates a racist animus towards members of Plaintiff's protected class and reveals the decisonmaker's use of a racist stereotype in the context

14

of an employment decision.[10] Because "Congress designed Title VII to prevent the perpetuation of stereotypes and a sense of degradation which serve to close or discourage employment opportunities" for members of a protected class, a statement which suggests that an employment decision was motivated by a racist stereotype is relevant evidence of intent and motive. *Andrews v. City of Phila.*, 895 F.2d 1469, 1483 (3d Cir. 1990); *see also Chadwick v. WellPoint, Inc*., 561 F.3d 38, 44 (1st Cir. 2009) (finding that "adverse job actions" based on sex-stereotypes constituted unlawful discrimination); *Robinson v. Runyon*, 149 F.3d 507, 515 (6th Cir. 1998) ("the racially inflammatory nature of the evidence involved here is precisely why it is probative of the racially discriminative motives alleged in this case."). Thus, contrary to Defendant's suggestion, the use of racial slurs and stereotypes that exhibit racial animus and bias is relevant to the issue of an employer's discriminatory intent.

In sum, there is a close enough relationship between the alleged Jones statement and the facts of this case such that, if credited, a jury may find the Jones statement probative of Jones' intent regarding Plaintiff's termination. *Ansell,* 347 F.3d at 523; *Becker,* 207 F.3d at 194 n. 8; *Abrams*, 50 F.3d at 1214; *Fuentes*, 32 F.3d at 765. Accordingly, viewing the facts in the light most favorable to the Plaintiff, the Court finds that Plaintiff has "produce[d] enough evidence to enable a reasonable factfinder to conclude that the proffered reason is false" and has therefore "earned the right to present his . . . case to the jury." *Marzano,* 91 F.3d at 508. Defendant's Motion for Summary Judgment on Plaintiff's Title VII claim for wrongful termination is therefore denied.

---

[10]    In *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 368 (3d Cir. 2008), the Third Circuit noted that "stray remarks by decision-makers, which [a]re unrelated to the decision-making process, are rarely to be given weight, particularly if they are made temporally remote from the date of the decision." According to Hubert, the remark was made in the context of his termination. (Hubert Dep. at 6, Dkt. No. 115-3).

### 2. Assignment of Overtime

To establish a *prima facie* case of employment discrimination regarding overtime, the standard *McDonnell Douglas* framework applies. Thus, Plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified to perform the overtime; (3) he suffered an adverse employment action; (4) under circumstances that support an inference of discrimination. *Swierkiewicz,* 534 U.S. at 510. The fourth element of the *prima facie* case can be made by showing that "another, not in the protected class, was treated more favorably." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Ed.*, 470 F.3d 535, 539 (3d Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. at 802-03); *see also Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993) (same).

Here, the first three elements of Plaintiff's *prima face* case are not contested. Rather, IMC argues that Plaintiff has failed to establish the fourth element of the *prima facie* case. (Def.'s MSJ at 6, Dkt. No. 104). Specifically, IMC argues that Plaintiff has failed to demonstrate that the circumstances under which he was not assigned overtime support an inference of discrimination in that the evidence shows that Ray, who was paid $18.00 per hour, was given the overtime rather than Plaintiff, who was paid $25.00 per hour, because Ray could perform the overtime work at a lower cost than Plaintiff. *Id*. IMC also argues that the fact that Williams, a Black West-Indian, was assigned overtime undermines any claim that Plaintiff was denied overtime on the basis of his race or national origin. *Id.* at 8.

In his Opposition to Defendant's Motion for Summary Judgment, Plaintiff argues that IMC, through Dooley Jones, "allocated overtime work on the basis of race" in that Ray, a "White statesider who was plaintiff's helper" was assigned overtime "although he did not have the proper qualifications"—*i.e*., he was not a mechanic. (Plt.'s Opp. to MSJ at 2, 8, Dkt. No. 168).

16

Plaintiff has pointed to evidence that Ray, an employee outside Plaintiff's protected class, was treated more favorably in relation to overtime assignments. (Galloway Dep. at 10-12, 14-16, Dkt. No. 114-1). This suffices for Plaintiff to establish the fourth prong of his *prima facie* case. *See Scheidemantle*, 470 F.3d at 539-40 (finding that person who received more favorable treatment did not fall within Title VII's protections, and therefore plaintiff satisfied that prong of the *prima facie* test).

IMC offers a legitimate, nondiscriminatory reason for its decision not to assign Plaintiff overtime—it "chose to use employees who were paid a lower rate to perform the weekend tasks rather than Plaintiff at his higher rate." (Def.'s MSJ at 7, Dkt. No. 104). Jones explained that Josh Ray was paid $7.00 less an hour than Galloway, "and it didn't make any sense to bring somebody in [for a simple job] and pay them 25 an hour when I could pay somebody 1[8] to do it. And that's just me saving the company money is what it is." (Jones Dep. at 19, Dkt. No. 115-1). As discussed above, IMC's effort to save money is a legitimate, nondiscriminatory reason for choosing Ray and Williams, rather than Galloway, to work overtime. *Lidwell,* 116 F. Supp. 2d at 584; *Morris,* 2010 WL 3211166, at *4.

The burden then shifts to Plaintiff to show that this reason was a pretext for discrimination. Plaintiff has produced evidence that Dooley Jones—the person who assigned overtime work—used the word "nigger" frequently in personal conversations with Rollins. (Rollins Dep. at 24-25, Dkt. No. 115-4). Plaintiff also produced evidence that Jones used this same racial slur and engaged in racial stereotyping and degradation in dealing with other members of Galloway's protected class by asserting that "the niggers here don't know nothing, and that's why we bring guys from the states" when he fired a black West Indian employee. (Hubert Dep. at 4, Dkt. No. 115-3). Because there is evidence that Jones was Plaintiff's "boss"

and was responsible for assigning overtime to Plaintiff, the Court finds that the evidence of his alleged racial animus and bias is relevant to the pretext inquiry regarding the assigning of overtime to Plaintiff. For the same reasons that the Court has denied IMC's Motion for Summary Judgment regarding Plaintiff's termination claim, this evidence of alleged racism in Jones' decision-making process would allow a factfinder to "reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision." *Fuentes*, 32 F.3d at 765.

Accordingly, viewing the facts in the light most favorable to Plaintiff, the Court finds that Galloway has raised a question of material fact that IMC's decision not to assign him overtime was motivated by discrimination, and denies summary judgment to IMC on this aspect of Plaintiff's Title VII cause of action.

### 3. Retaliation

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that: "'(1) []he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action.'" *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). Plaintiff claims that his termination and IMC's refusal to rehire him were in retaliation for two different forms of protected activity—his complaint to the Virgin Islands Department of Labor and his alleged complaints to IMC that he was not receiving overtime.

In support of the retaliation claim regarding his Department of Labor complaint, Plaintiff states that he "went to see IMC's Buddy Martin in June 2008 after the Department of Labor sent [him] back to IMC to get rehired since the job was still ongoing . . . Buddy Martin told Plaintiff

that IMC did have mechanic work for him to do but IMC's President Bob Turnage was refusing to rehire Plaintiff since Plaintiff had reported his wrongful discharge and discrimination to the DOL." (PCSOF at ¶ 15; *see also* Galloway Dep. at 12, Dkt. No. 114-1). IMC argues that Plaintiff cannot establish the third element of his *prima facie* case of retaliation—causation—because it is factually impossible for the above Buddy Martin conversation to have occurred in "June 2008," as described by Plaintiff, when the undisputed evidence shows that Plaintiff did not lodge a complaint with the Virgin Islands Department of Labor until *July 8, 2008*. (*See* Def.'s Reply at 11, Dkt. No. 176). In support of this argument, IMC submits Plaintiff's Department of Labor Complaint, which is dated July 8, 2008. (*See* DOL/EEOC Complaint, Dkt. No. 133-4).

To find for Defendant as a matter of law on this retaliation claim, the Court would have to conclude that, notwithstanding the possibility of at least two alleged interactions with the Department of Labor—one prior to the "June 2008" conversation with Martin and one on July 8, 2008, when Plaintiff filed his complaint with the Department of Labor—the claimed "report[ing] [of Plaintiff's] wrongful discharge and discrimination to the DOL" necessarily correlates with the filing of the official complaint of discrimination in July 2008.[11] (PCSOF at ¶ 15; *see also* Galloway Dep. at 12, Dkt. No. 114-1). The Court would also have to conclude that the timing of the alleged Buddy Martin conversation to which Plaintiff testified was not an approximation or mistake, but factually accurate, thus creating an inconsistency between the timing of the

---

[11]     The fact that Plaintiff filed a complaint with the Department of Labor on July 8, 2008, does not rule out the possibility that he went to the Department of Labor before filing his official complaint. At his deposition, Plaintiff testified that "when I went to Labor Relations, they told me to ask back for my job. And Buddy Martin told me Bob Turnage said he would not hire me back, even though they needed my skills, because I reported him to Labor Relations."  (Galloway Dep. at 12, Dkt. No. 114-1).

conversation in mid-June and the filing of the official complaint in July 2008.[12] These considerations suggest that there are genuine issues of material fact that preclude a grant of summary judgment.

Plaintiff also contends that he can show that his termination was "actually retaliation for his multiple complaints of discrimination in overtime." (Plt.'s Opp. to MSJ at 12, Dkt. No. 168). Defendant does not directly address this contention but, without citing legal authority, implies that it is improper because Plaintiff did not make this specific retaliation claim in his First Amended Complaint. (Def.'s Reply at 11, Dkt. No. 176). Assuming *arguendo* that Plaintiff's retaliation claims are limited to those specific allegations outlined in his First Amended Complaint, Defendant's argument would still lack merit. In the First Amended Complaint, Plaintiff alleged that "[o]n May 26, 2008, Plaintiff complained to Dooley Jones that he was assigning Plaintiff's overtime work to white statesiders who were not qualified to do the work . . . . Plaintiff was further terminated as a result of discrimination and retaliation for complaining of discrimination." (FAC at ¶¶ 20, 26, Dkt. No. 32-1). Thus, contrary to Defendant's contention, Plaintiff alleged in his First Amended Complaint that his termination was in retaliation for complaining that overtime was being given to "white statesiders."

Additionally, Plaintiff has come forward with evidence to support the allegation that he complained to Dooley Jones that white workers were getting overtime that he should have been awarded. During his deposition Galloway was asked: "Prior to May 2008, had you complained

---

[12]     Plaintiff provided the "middle of June" 2008 date for the Buddy Martin conversation in response to the question: "*About how long or approximately* when did you go to see Buddy Martin?" (Galloway Dep. at 16, Dkt. No. 114-1) (emphasis added). Notably, the question called for an approximation of the time of the visit with Buddy Martin. Based on the approximation called for by the question, the fact that July 8, 2008 is within 2-3 weeks of the "middle of June" 2008, and the fact that Plaintiff's deposition occurred nearly three years after the events at issue took place, a reasonable jury could find that Plaintiff was simply mistaken when he testified that he went to Buddy Martin in June 2008, as opposed to July 2008.

that you weren't getting overtime, but that overtime was being assigned to less qualified white workers?" He answered: "I can recall complaining in May." (Galloway Dep. at 13-14, Dkt. No. 114-1; see also DOL Complaint, Dkt. No. 133-4). Jones, who was responsible for assigning overtime work, testified that he recalls Galloway complaining about not receiving overtime. (Jones Dep. at 19-20, Dkt. No. 115-1). Together, this evidence creates a genuine issue of material fact that Galloway engaged in protected activity by verbally complaining to IMC personnel responsible for assigning overtime that he was being discriminated against in the assignment of overtime. *See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) (pointing out that "'informal protests of discriminatory employment practices, including making complaints to management'" constitute "acceptable forms of protected activity under Title VII [ ]") (citation omitted). Further, the proximity in time between Galloway's complaint about overtime (sometime in May), and his termination on May 27, is sufficient to create a genuine issue of material fact of the causal link between the protected activity and his termination. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997) ("[T]emporal proximity. . . is sufficient to establish a causal link."); *see also LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (opining that when the "temporal proximity" between the protected activity and adverse action is "unduly suggestive," this is "sufficient standing alone to create an inference of causality and defeat summary judgment.").

Viewing the facts in the light most favorable to Plaintiff, the Court finds that there are genuine issues of material fact which preclude summary judgment on Plaintiff's retaliation claim. Accordingly, the Court denies IMC's Motion for Summary Judgment on Plaintiff's retaliation cause of action.

**4.  Promotion Claim**

21

A plaintiff establishes a *prima facie* case of failure to promote by showing: "'(i) that he belongs to a [protected category]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.'" *Noel v. The Boeing C*o., 622 F.3d 266, 274 (3d Cir. 2010) (quoting *Fuentes*, 32 F.3d at 763).

Galloway argues that he was "qualified for the promotion to Supervisor of heavy equipment, which he was denied in favor of a White stateside employee, Jerry Rollins, although he performed the work." (Plt.'s Opp. to MSJ at 5, Dkt. No. 168). He claims that Rollins was "less qualified" than he was, as Rollins could not operate the larger linkbelt and Manitowoc cranes which Plaintiff could operate. *Id.* at 1. Plaintiff also asserts that IMC's reason for not promoting him—that it did not need a foreman of heavy equipment position on the HRSG Project—is false because the company brought down Rollins from the States to fill that position. *Id.* at 1, 5.

Plaintiff's only evidence in support of his failure to promote claim is Spann's alleged promise that Galloway would be made the "heavy equipment foreman" when IMC "got everything organized," and Dooley Jones' alleged statement that IMC "brought a guy down by the name of Jerry Rollins" who was "over the equipment . . . as a foreman." (Galloway Dep. at 6, 7, Dkt. No. 114-1). Assessing the evidence in the light most favorable to Plaintiff, this evidence is insufficient to make out a *prima facie* case of failure to promote.

First, Plaintiff has failed to demonstrate that IMC was ever "seeking applicants" for the "foreman" position that he claimed he was promised.[13] Plaintiff's testimony is that Spann promised him a foreman position "after they got [themselves] organized." (Galloway Dep. at 6, Dkt. No. 114-1). No other details were discussed. *Id.* This type of vague promise is insufficient to establish that IMC was actually seeking applicants for a "foreman" position. *See Noel*, 622 F.3d at 274 (plaintiff must show "that he applied and was qualified for a job *for which the employer was seeking applicants*") (emphasis added); *see also Taylor v. Brandywine Sch. Dist.*, 202 F. App'x. 570, 576 (3d Cir. 2006) (holding that plaintiff had failed to demonstrate a *prima facie* case of failure to promote under Title VII because "[s]he is unable to name specific dates when positions were available" and "her testimony on this topic is too vague to create an inference of discrimination.").[14]

Further, Jones alleged statement that IMC brought Rollins down as a "foreman . . . over the equipment" does not establish that Rollins was given the "foreman" position that Plaintiff allegedly was promised. The undisputed evidence shows that Rollins first arrived in the Virgin Islands to work on the HRSG Project in October 2007—before Plaintiff was hired. (Rollins Dep. at 4, 7, Dkt. No. 115-4). His duties were to "mak[e] sure the equipment was running well." *Id.* at

---

[13]     In his brief, Plaintiff variously refers to the position that he was allegedly promised as "foreman" (Dkt. No. 168 at 1, 6, 16), "Equipment Foreman," (*id.* at 11), "Equipment Supervisor," (*id.* at 16, n.2), and "Supervisor of heavy equipment" (*id.* at 5).

[14]     *See also Jones v. City of Springfield, Ill.*, 554 F.3d 669, 673 (7th Cir. 2009) (noting that "in a failure-to-promote claim, a *prima facie* case presupposes the existence of an open position" and observing that "[t]he lack of an opening is always a legitimate reason for refusing to hire or promote."); *Geatti v. AT&T*, 232 F. App'x 101, 103 (3d Cir. 2007) (holding that without a position for plaintiff to be promoted to, a failure to promote claim must fail at the *prima facie* stage); *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000) (to establish a *prima facie* case for non-selection, plaintiff must show there was a "'vacancy in the job sought.'" (citation omitted)); *Hayslett v. Perry*, 332 F. Supp. 2d 93, 100 (D.D.C. 2004) ("Lacking evidence of an available position, plaintiff cannot establish a *prima facie* case of employment discrimination based on non-promotion.").

7. Rollins became sick, returned to the States, and came back to St. Croix to work in the same capacity between January 25, 2008 and April 5, 2008. *Id.* at 7, 9. He was still employed by IMC during his absence from the HRSG site. *Id.* The undisputed facts demonstrate that Rollins returned to the position that he previously held. Because Rollins began working at IMC *prior to* Plaintiff in the same capacity that he worked when he returned from being sick in January 2008, Jones' alleged statement to Plaintiff that Rollins was brought down to be a "foreman" does not create a genuine issue of material fact that he was given the foreman job allegedly promised to Plaintiff by Spann. *Noel,* 622 F.3d at 274.

Plaintiff has failed to demonstrate that IMC actually had an opening for the "foreman" position that he allegedly was promised by Spann, or that any such position was filled by IMC with someone else, or that the position remained open and IMC continued to look for applicants. *Noel,* 622 F.3d at 274. Thus, Plaintiff has failed to demonstrate a *prima facie* case of failure to promote. Accordingly, viewing the facts in the light most favorable to Plaintiff, the Court finds that Galloway has failed to raise a genuine issue of material fact regarding his failure to promote claim, and grants summary judgment to IMC on this aspect of Plaintiff's Title VII cause of action.[15]

**5. Hostile Work Environment**

---

[15]     Even assuming that Plaintiff could establish a *prima facie* case, the determination by Talbot, the Project Manager, that IMC did not need an equipment foreman on the HRSG Project would constitute a legitimate, non-discriminatory reason for a failure to promote Plaintiff. Plaintiff's attempt to establish pretext by arguing that Rollins was brought down from the States to fill the position would fail to create a genuine issue of material fact for the same reasons discussed above. *See Vuong v. Mgmt. of J.C. Penney's Co.,* 169 F. App'x 675, 677 (3d Cir. 2006) (observing, with respect to plaintiff's promotion claim that, at the pretext stage, she failed to "submit any evidence showing that the positions she requested actually existed or had openings at the times she applied."); *Marzano,* 91 F.3d at 502-04.

In his Opposition to IMC's Motion for Summary Judgment, Galloway maintains—for the first time in this litigation—that he has alleged a hostile work environment theory and that there are "genuine issues of material fact on Plaintiff's claim of a hostile work environment." (Plt.'s Opp. to MSJ at 10, Dkt. No. 168). He sets forth the standard for a hostile work environment *prima facie* case and argues that the evidence of record satisfies that standard.

Defendant responds that because Plaintiff failed to allege a hostile work environment claim in his EEOC Complaint, he is now barred from making that claim. (Def.'s Reply at 1-2, Dkt. No. 176). IMC further argues that even a liberal reading of Plaintiff's Complaint did not put IMC on notice of such a claim. *Id*. Defendant adds that even if that cause of action was before the Court, Plaintiff could not demonstrate a *prima facie* case. *Id.* at 9-11.

A plaintiff bringing an employment discrimination complaint under Title VII must exhaust his administrative remedies by filing a timely discrimination charge with the EEOC. *See* 42 U.S.C. §§ 2000e–5(b), (e)(1), (f)(1).

> The relevant inquiry in determining whether claims have been administratively exhausted is "whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Antol v. Perry,* 82 F.3d 1291, 1295 (3d Cir. 1996) (quoting *Waiters,* 729 F.2d at 237). Put another way, "a district court may assume jurisdiction over additional charges if they are reasonably within the scope of the complainant's original charges and if a reasonable investigation by the EEOC would have encompassed the new claims." *Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1212 (3d Cir.1984); *Webb v. City of Phila.,* 2007 WL 210405, at *2 (E.D. Pa. Jan.23, 2007).

*Frazier v. Exide Techs.,* 2012 WL 440398, at *2 (E.D. Pa. Feb. 13, 2012). In other words, for Plaintiff to assert a hostile work environment claim in this Court, a hostile work environment claim must be "fairly within the scope" of his EEOC complaint. *Id*.; *see also Webb v. City of Phila.,* 562 F.3d 256, 262-63 (3d Cir. 2009) (While "the 'preliminary requirements for a Title VII action are to be interpreted in a nontechnical fashion,' the aggrieved party 'is not permitted

to bypass the administrative process.'") (quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398 (3d Cir. 1976)).

'"[W]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (citation omitted). In order to state a hostile work environment claim, a plaintiff must plead, *inter alia*, that "he suffered intentional discrimination because of his race" and that "the discrimination was pervasive and regular." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir.2005) (internal brackets and citations omitted).[16] The harassment must be "so 'severe or pervasive' that it alter[ed] the conditions of his employment and create[d] 'an abusive work environment.'" *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 182 (3d Cir. 2009) (quoting *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001)). "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted); *see also Frorup-Alie v. V.I. Housing Fin. Auth.*, 2004 WL 1092317, at *3 (D.V.I. Mar. 12, 2004) (observing that a hostile work environment exists where plaintiff can show that work environment was "'both objectively and subjectively offensive, one that a reasonable person would fin[d] hostile or abusive, and one that the victim in fact did perceive to be so.'") (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)).

---

[16]     To prevail on a claim for hostile work environment a plaintiff must demonstrate that: (1) he suffered intentional discrimination because of the protected factor (in this case, race); (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person of the same [race] in that position; and (5) the existence of respondeat superior liability. *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

In his EEOC Complaint, Plaintiff alleges that he was hired at a lower salary and benefits than less competent white workers; he was promised a promotion that he never received; he made complaints about discrimination that were never investigated; he was not given overtime because of his race and national origin; and he and other "local" workers were terminated and replaced by white stateside workers at higher pay. (DOL/EEOC Compl. ¶¶ 3, 4, 5, 8, 10, Dkt. No. 133-4). These allegations are insufficient to assert, or give notice of, a claim for a hostile work environment. First, there is no express reference to a claim for a hostile work environment. Further, the allegations are devoid of the kind of severe and pervasive conditions that characterize the abusive working environment necessary to support or suggest a hostile work environment. While Plaintiff's allegations to the EEOC are sufficient to have put the EEOC on notice of discrete disparate treatment discrimination claims regarding pay, promotion, overtime, and termination, a hostile work environment claim is not "fairly within the scope" of the allegations. *Antol,* 82 F.3d at 1295; *Howze,* 750 F.2d at 1212. Thus, Galloway's EEOC allegations are not "sufficiently related" to claims of a hostile work environment "to excuse [his] failure to administratively exhaust it." *Webb*, 562 F.3d at 263; *see also Rowan v. City of Bayonne,* 474 F. App'x 875, 2012 WL 1184028, at *2 (3d Cir. Apr. 10, 2012) (holding that plaintiff's EEOC complaint addressed only failure to promote and retaliation claims, and the district court properly disregarded plaintiff's hostile work environment allegations). The Court therefore grants Defendant's Motion for Summary Judgment on Plaintiff's hostile work environment claim that was raised for the first time in his Opposition to the Motion for Summary Judgment.

### C.  Virgin Islands Civil Rights Act Claim

In Count 2 of his Complaint, Galloway asserts that IMC's alleged discriminatory conduct violated the Virgin Islands Civil Rights Act ("VICRA"), 10 V.I.C. §§ 1-11. (FAC at ¶¶ 34-36, Dkt. No. 32).[17] He contends that the evidence and arguments in support of his Title VII claims of race discrimination and hostile work environment apply equally to his causes of action under VICRA. (Plt.'s Opp. to MSJ at 14, Dkt. No. 168). IMC essentially repeats its Title VII arguments that Galloway cannot establish a *prima facie* claim of employment discrimination under VICRA because he cannot establish that the adverse employment actions occurred under circumstances that gave rise to an inference of discrimination or, alternatively, he cannot show that IMC's legitimate, non-discriminatory reasons are pretextual. (Def.'s MSJ at 10-11, Dkt. No. 104; Def.'s Reply at 12-13, Dkt. No. 176).

An aggrieved employee has a private right of action for employment discrimination under 10 V.I.C. §§ 1-11. *See Figueroa v.Buccaneer Hotel, Inc.,* 188 F.3d 172, 177 (3d Cir. 1999). "Together, 10 V.I.C. §§ 3 & 7 provide a private cause of action against an employer or business who 'engage[s] in or permit[s] any discrimination or differential in pay or working conditions for workers doing the same work, on account of race, creed, color, or national origin.'" *Glasgow v. Veolia Water N. Am. Operating Servs. LLC*, 2010 WL 3780966, at *7 (D.V.I. Sept. 21, 2010) (citation omitted).

The parties import the same arguments they made in the Title VII race discrimination context to the VICRA cause of action, and do not appear to dispute the applicability of the same legal and evidentiary standards in both contexts. (Def.'s MSJ at 10-11, Dkt. No. 104; Plt.'s Opp.

---

[17]     Galloway also cites Chapter 5 of VICRA (which encompasses 10 V.I.C. §§ 61-72) in Count 2 of his First Amended Complaint as legal authority for his discrimination claims. (*See* FAC at ¶ 35, Dkt. No. 32-1). Defendant correctly notes that there is no private right of action under 10 V.I.C. §§ 61-72. (MSJ at 10, n.3, Dkt. No. 104). *See Bostic v. AT&T of the Virgin Islands*, 2003 WL 25322909, at *3, *4 (D.V.I. Apr. 16, 2003).

to MSJ at 14, Dkt. No. 168; Def.'s Reply at 12-13, Dkt. No. 176). Finding no reason to apply different standards, the Court will evaluate the Title VII and VICRA claims under the same standards. *See, e.g., Desir v. Hovensa, L.L.C.*, 2012 WL 762122, at *6 (D.V.I. Mar. 7, 2012) (stating that because defendant did not "differentiate between the Title VII and Virgin Islands [Civil Rights] Act claims and does not dispute that the same legal and evidentiary standards apply to both sets of claims," the court would address the claims together and adjudicate the local claims in the same manner that it adjudicated the federal claims). Therefore, the conclusions the Court has reached under Galloway's Title VII termination, overtime, and promotion claims would also obtain under VICRA. Based on that approach, the Court denies summary judgment to IMC on the VICRA termination and overtime claims, and grants summary judgment to IMC on the promotion claim.

Plaintiff also alleges a hostile work environment claim under VICRA. (Plt.'s Opp. to MSJ at 15, Dkt. No. 168). While there is no administrative exhaustion requirement as in the Title VII context, IMC responds that because Galloway failed to allege a hostile work environment claim in his First Amended Complaint, that claim is not properly before the Court, and the Court should therefore decline to consider Plaintiff's hostile work environment arguments. (Def.'s Reply at 2, Dkt. No. 176). The Court agrees.

Plaintiff's Complaint generally alleges that local black workers performed the same or similar work as white skilled workers, but were classified differently and earned a lower salary. The First Amended Complaint specifically refers to Plaintiff receiving "less pay, benefits, overtime than the white stateside hires." (FAC at ¶¶ 9, 25, Dkt. No. 32). The Complaint also asserts that Dooley Jones informed local workers that "they were being laid off so that white stateside non West Indian workers could be brought in to work." *Id.* at ¶ 23.

As is the case with his complaint to the Department of Labor, Plaintiff's First Amended Complaint does not state facts sufficient to allege a hostile work environment claim. As indicated above in the Title VII analysis, for a hostile work environment claim, Plaintiff must have alleged facts showing that "he suffered . . . pervasive and regular . . . intentional discrimination because of his race," *Caver,* 420 F.3d at 262, "so severe or pervasive that it alter[ed] the conditions of his employment and create[d] an abusive work environment." *Brown,* 581 F.3d at 182 n.4. Allegations of racially-based pay disparities, without more, do not constitute the kind of severe and pervasive harassment contemplated by a hostile work environment. Further, a single comment that ostensibly favors white workers over similarly situated local black workers does not suggest the kind of severe and pervasive conditions that would make a work environment racially hostile. *See, e.g., Drinkwater v. Union Carbide Corp.,* 904 F.2d 853, 863 (3d Cir. 1990) ("Hostile environment harassment claims must demonstrate a continuous period of harassment, and two comments do not create an atmosphere."); *Perry v. Harvey*, 2008 WL 2704365, at *3 (D.N.J. July 3, 2008) ("'[A] mere utterance of an epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII.") (citation omitted).

Plaintiff did not plead sufficient facts to support a hostile work environment claim; he did not amend his First Amended Complaint to add such a claim; and he cannot now, in his Opposition to IMC's Motion for Summary Judgment, raise such a claim for the first time. *See Anderson v. DSM N.V.,* 589 F. Supp. 2d 528, 534 n.5 (D.N.J.2008) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") (quoting *Shanahan v. City of Chi.,* 82 F.3d 776, 781 (7th Cir.1996)). The Court will therefore

grant summary judgment to Defendant on Plaintiff's hostile work environment claim under VICRA.

Finally, Galloway asserts that he was retaliated against under VICRA, 24 V.I.C. § 451a.[18] For the same reasons that the Court denied IMC's Motion for Summary Judgment regarding Plaintiff's Title VII claim of retaliation stemming from his Department of Labor complaint, the Court reaches the same conclusion here.

However, the Court reaches a different conclusion with regard to the retaliation claim grounded in Plaintiff's alleged complaint to IMC management. To support an actionable claim for retaliation under VICRA, 24 V.I.C. § 451a(a) requires that a person complain, or be about to complain, to a "public body." 24 V.I.C. § 451a(a); *Glasgow*, 2010 WL 3780966, at *7 n.10 (observing that plaintiff must report alleged discrimination to a public body before he was fired in order to constitute a retaliation claim). Plaintiff's Title VII claim that his termination was in retaliation for his verbal complaints to IMC management about discrimination in overtime fails as a matter of law, because IMC is not a "public body." 24 V.I.C. § 451a(a); *Glasgow*, 2010 WL 3780966, at *7 n.10. Accordingly, Plaintiff's VICRA retaliation claim on that basis does not survive summary judgment.

---

[18]     Section 451a(a) provides:

> (a) An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of this chapter, regulation or rule promulgated pursuant to the law of this territory or the United States to a *public body*, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing or inquiry held by that public body, or a court action.

24 V.I.C. § 451a(a) (emphasis added).

In sum, the Court denies IMC's Motion for Summary Judgment on Plaintiff's VICRA termination, overtime, and retaliation (based on his complaint to the Department of Labor) claims, and grants summary judgment on the VICRA promotion, hostile work environment, and retaliation (based on his alleged complaint to IMC) claims.

### D. Wrongful Discharge Act Claim

Count 3 of the Complaint alleges that Plaintiff was wrongfully discharged from employment under the Virgin Islands Wrongful Discharge Act ("WDA"), 24 V.I.C. § 76. Pursuant to the WDA, an employer may dismiss an employee for nine enumerated reasons which generally relate to an employee's behavior on the job.[19] In addition to those nine reasons, the WDA provides:

> Any employee discharged for reasons other than those stated in subsection (a) of this section shall be considered to have been wrongfully discharged; however, nothing in this section shall be construed as prohibiting an employer from terminating an employee as a result of the cessation of business operations or as a result of a general cutback in the work force due to economic hardship[.]

24 V.I.C. § 76(c)).

---

[19]     Under the WDA, an employer may dismiss an employee:

(1) who engages in a business which conflicts with his duties to his employer or renders him a rival of his employer; (2) whose insolent or offensive conduct toward a customer of the employer injures the employer's business; (3) whose use of intoxicants or controlled substances interferes with the proper discharge of his duties; (4) who willfully and intentionally disobeys reasonable and lawful rules, orders, and instructions of the employer; provided, however, the employer shall not bar an employee from patronizing the employer's business after the employee's working hours are completed; (5) who performs his work assignments in a negligent manner; (6) whose continuous absences from his place of employment affect the interests of his employer; (7) who is incompetent or inefficient, thereby impairing his usefulness to his employer; (8) who is dishonest; or (9) whose conduct is such that it leads to the refusal, reluctance or inability of other employees to work with him.

24 V.I.C. § 76(a).

In *Rajbahadoorsingh v. Chase Manhattan Bank, NA*, 168 F. Supp. 2d 496 (D.V.I. 2001), this Court applied the *McDonnell Douglas* burden-shifting paradigm to claims under the WDA. *Id.* at 504-05; *see also Webster v. CBI Acquisitions, LLC*, 2012 WL 832044, at *2 (V.I. Super. Ct. Mar. 5, 2012) ("If the reason given for the discharge falls under one of the acceptable grounds listed in the Act . . . the plaintiff may assert a reason for which the employer's justification for termination is a pretext for a wrongful discharge."). In other words, a claim under the WDA operates substantially the same as a claim alleging discrimination in termination under Title VII. *Rajbahadoorsingh,* 168 F. Supp. 2d at 505-06 ("The burden is thus the same for both WDA and Title VII claimants.").

Here, IMC asserts that Plaintiff's termination does not run afoul of the WDA because it was part of a bona fide reduction in force. In response, Plaintiff repeats the same arguments made in support of his Title VII claim and argues that the reduction in force was a pretext for racial discrimination. For the same reasons that Plaintiff's Title VII claim alleging discrimination in termination survives summary judgment, so too must his claim under the WDA. Accordingly, the Court denies Defendant's Motion for Summary Judgment on Plaintiff's WDA claim.

### E.  Implied Covenant of Good Faith and Fair Dealing

"The implied covenant of good faith and fair dealing states that '[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.'" *Desir,* 2012 WL 762122, at *7 (quoting *Smith v. V.I. Water & Power Auth*., 2008 WL 5071685, at *8 (D.V.I. Nov. 24, 2008)).

To succeed on a cause of action for breach of the covenant of good faith and fair dealing, a plaintiff must "prove acts by the defendant 'that amount to fraud, deceit, or misrepresentation.'" *Smith*, 2008 WL 5071685, at *8 (quoting *Marcano v. Cowpet Beach Resort,*

*Inc.*, 1995 WL 217600, at *4 (Terr. Ct. V.I. Mar. 9, 1995)). To successfully allege an act of fraud or misrepresentation, "a complainant must demonstrate: (1) a knowing misrepresentation of a material fact, (2) intent by the defendant that the plaintiff would rely on the false statement, (3) actual reliance, and (4) detriment as a result of that reliance." *Mendez v. Coastal Sys. Dev't, Inc.*, 2008 WL 2149373, at *10 (D.V.I. May 20, 2008).

IMC argues that Plaintiff cannot show that it did anything that amounts to fraud or deceit. (Def.'s MSJ at 13, Dkt. No. 104). In response, Plaintiff argues that the evidence demonstrates two instances of breach of the covenant of good faith and fair dealing.  First, Plaintiff argues that IMC committed a misrepresentation when it promised him, through Spann, that he would be given a foreman position. (Plt.'s Opp. to MSJ at 16, Dkt. No. 168). Plaintiff then argues that because Spann lacked the ability to hire Plaintiff (*see* Turnage Dep. at  3, Dkt. No. 114-8), Spann's alleged promise to Plaintiff that he would be promoted to foreman must have been a misrepresentation, which is chargeable to IMC.

Plaintiff has failed to create a genuine issue of material fact regarding his contention that Spann made a misrepresentation. Misrepresentation requires proof that the *maker* of the false statement knew that it was false when made and intended to deceive the recipient. *Mendez*, 2008 WL 2149373, at *10. Plaintiff has produced no evidence that Spann knew that his alleged promise to Galloway was false at the time that he allegedly made it. Further, Plaintiff makes no argument and offers no proof that Spann *intended* to deceive Galloway. This lack of evidence regarding Spann's knowledge and intent is fatal to Plaintiff's breach of the duty of good faith and fair dealing cause of action. *See Dameshek v. Encompass Ins. Co. of Am.*, 2012 WL 2389894, at *5 (M.D. Pa. June 25, 2012) ("[N]othing in the record would support a finding that Mr. Dunn, acting as an agent of Defendant, knew his representation was false or was reckless as to the truth

or falsity of his representation. . .  [or] would support a finding that Mr. Dunn's representation . . . was made with the intent of misleading Plaintiffs into relying on it. . . . Because the record evidence does not support a finding that Defendant made a misrepresentation with intent to mislead Plaintiffs, the Court will enter summary judgment in favor of Defendant[.]").[20]

Plaintiff has also failed to demonstrate a genuine issue of material fact regarding his claim that IMC breached its covenant of good faith and fair dealing when it allegedly misrepresented that the reason for his termination was a reduction in force and that there was no overtime work available for him. (Plt.'s Opp. to MSJ at 16-17, Dkt. No. 168). Even though Plaintiff has created a genuine issue of material fact regarding whether he was terminated for discriminatory reasons, he has failed to show that he detrimentally relied on IMC's statement that he was terminated because of a reduction in force. To the contrary, it appears that Plaintiff did not rely on IMC's statement or take it at face value as he lodged a complaint with the Virgin Islands Department of Labor approximately six weeks after he was terminated asserting that he was terminated for discriminatory reasons. He thus challenged the reason proffered by IMC for the termination. (*See* DOL Complaint, Dkt. No. 133-4). Plaintiff has similarly failed to provide any evidence that he detrimentally relied on IMC's statement that there was no overtime work

---

[20]    In addition, Galloway has offered no evidence that he detrimentally relied on Spann's alleged misrepresentation. To the contrary, Galloway testified that he was promised the foreman position a few days *after* he was already hired. (Galloway Dep. at 6-7, Dkt. No. 114-1). Thus, Galloway could not have relied on the alleged misrepresentation at the time that he accepted the job. *See Stern v. Seykota*, 2007 WL 683753, at *3 (D.V.I. Jan. 17, 2007) (holding that where plaintiff could not show that defendant who made allegedly false statement knew it was false when it was made, or that plaintiff relied on the promise when she decided to work for defendant, the misrepresentation claim did not survive summary judgment); *Clunie-Haskins v. State Farm Fire & Cas. Co.*, 2012 WL 691407, at *11 (E.D. Pa. Mar. 5, 2012) (noting that because plaintiffs could not point "to sufficient evidence in the record to demonstrate an intentional misrepresentation or omission by [defendant] or its attorneys that was justifiably relied on by [the insureds] to their detriment, . . . Plaintiffs fail to create a genuine issue of disputed fact to survive summary judgment.").

35

for him, having challenged IMC's actions in not assigning him overtime work in his DOL Complaint. *Id.*

Plaintiff has thus failed to demonstrate a genuine issue of material fact regarding his claim that IMC breached the covenant of good faith and fair dealing. Accordingly, the Court will grant summary judgment to IMC on this cause of action.

### F. Punitive Damages

In Count V of his Complaint, Plaintiff seeks punitive damages, alleging that Defendant had "a pattern or practice of discriminating against local West Indian black employees in favor of stateside white employees" and that those actions were so outrageous and were done with such reckless disregard for Plaintiff's rights and interests that Plaintiff is entitled to punitive damages. (Compl. at ¶¶ 44-45, Dkt. No. 32).

"Punitive damages are awarded at the jury's discretion to 'punish the defendant for his outrageous conduct and to deter him and others like him [from] similar conduct in the future.'" *Warner v. Kmart Corp.*, 2009 WL 1476476, at *25 (D.V.I. May 27, 2009) (quoting *Restatement (Second) of Torts* § 908(1)). It is well settled that a claim for punitive damages is not a distinct cause of action. *McDonald v. Davis*, 2009 WL 580456, at *16 (D.V.I. Mar. 5, 2009) (collecting cases). Certain of Plaintiff's Title VII and VICRA claims, as well as his WDA claim, have survived summary judgment. In Title VII cases, punitive damages are awarded for "intentional discrimination where 'the complaining party demonstrates that the respondent engaged in . . . discriminatory practices with malice or with reckless indifference to . . . federally protected rights.'" *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 79 n.2 (3d Cir. 2009) (quoting 42 U.S.C. § 1981a(b)(1)). VICRA permits recovery of punitive damages "not to exceed $5,000" for "each and every such violation." 10 V.I.C. § 7(1). The WDA also allows a plaintiff to recover

36

punitive damages. *Sprauve v. CBI Acquisitions, LLC*, 2010 WL 3463308, at *8 (D.V.I. Sept. 2, 2010) (citing 24 V.I.C. § 79).

Because punitive damages is not a distinct cause of action, and therefore should not be pleaded as such, the Court grants IMC's motion for summary judgment to the extent that Plaintiff seeks to create an independent cause of action for punitive damages. However, Plaintiff will be allowed to seek punitive damages at trial, to the extent that the evidence supports such an award, with regard to his remaining viable claims under Title VII, VICRA, and the WDA.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, the Court grants in part and denies in part IMC's Motion for Summary Judgment.

The Court **GRANTS** IMC's Motion for Summary Judgment with respect to: (1) Plaintiff's Title VII claims for failure to promote and hostile work environment, (Count 1); (2) Plaintiff's Virgin Islands Civil Rights Act claims for failure to promote, retaliation (based on Plaintiff's alleged overtime complaints to IMC), and hostile work environment, (Count 2); (3) Plaintiff's claim for Breach of the Covenant of Good Faith and Fair Dealing, (Count 4); and (4) Plaintiff's independent cause of action for Punitive Damages, (Count 5).

The Court **DENIES** IMC's Motion for Summary Judgment with respect to: (1) Plaintiff's Title VII claims for discrimination in termination and failure to assign overtime, and for retaliation, (Count 1); (2) Plaintiff's Virgin Islands Civil Rights Act claims for discrimination in termination and failure to assign overtime, and for retaliation (based on Plaintiff's complaint to

the Department of Labor), (Count 2); and (3) Plaintiff's Wrongful Discharge Act claim, (Count 3).

       An appropriate Order accompanies this Memorandum Opinion.


Dated: September 11, 2012                      _____/s/_____
                                       WILMA A. LEWIS
                                       District Judge